| | | |
|---|---|---|
| DENISE DEFFEBAUGH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 10244 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Plaintiff Denise Deffebaugh sues her former employer, BNSF Railway Company.[1] Deffebaugh was a "trainmaster" for BNSF in Galesburg, Illinois for seven years until her firing in 2012. She alleges that the railroad discriminated and retaliated against her on the basis of her race and gender. BNSF now moves for summary judgment. For the reasons given in this Opinion, the motion is granted.

## I. Background

### A. Employment and Performance Issues

In evaluating the summary judgment motion, the Court views the facts in the light most favorable to Deffebaugh, and she is also entitled to all reasonable inferences. Deffebaugh was hired in January 2005 to work as a trainmaster at BNSF's Galesburg, Illinois terminal. R. 85, DSOF ¶ 5.[2] In that role, Deffebaugh's

---

[1]Jurisdiction is proper under 28 U.S.C. § 1331.

[2]Citation to the docket is "R." followed by the entry number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for BNSF's Statement of Facts); "PSOF"

responsibilities included scheduling cars, ensuring the on-time departure of trains, and overseeing the activities of the terminal's train-yard workers, including testing for compliance with safety regulations and assisting in their training. *Id*. ¶ 6. For most of her employment, Deffebaugh, along with the other trainmasters at the Galesburg terminal, reported to a terminal superintendent and an assistant terminal superintendent. In June 2011, BNSF hired a new superintendent, John Abrahamson, and changed this oversight structure, hiring four terminal managers. *Id*. ¶ 8. According to BNSF, this new level of management was aimed at improving terminal operations, as there was now a manager on site at all times to supervise personnel, including Deffebaugh and the other trainmasters. *Id*. ¶ 9.[3] Jason Curbow and Ty Christian were two of these terminal managers, who worked alongside and supervised Deffebaugh. *Id*. ¶ 10. Deffebaugh was the only female African-American trainmaster at Galesburg. PSOF ¶ 65. All five BNSF employees who were in supervisory positions over her were male, four Caucasian and one Native American. *Id*. ¶ 68.

---

(for Deffebaugh's Statement of Additional Facts) [R. 91 at 23-27]; "Pl.'s Resp. DSOF" (for Deffebaugh's Response to BNSF's Statement of Facts) [R. 91 at 1-22]; and "Def.'s Resp. PSOF" (for BNSF's Response to Deffebaugh's Statement of Additional Facts) [R. 94]. Where a fact is undisputed, only the asserting party's statement of facts is cited; where an assertion is made by one party and is otherwise challenged, it is so noted.

[3]Deffebaugh, as she does repeatedly in response to BNSF's statement of facts, objects to this statement of fact on the grounds that it is based on deposition testimony by Jason Curbow, one of Deffebaugh's supervisors and a former defendant in this case, that is inadmissible hearsay. Pl.'s Resp. DSOF ¶ 9. But Curbow, as the terminal manager, would have personal knowledge of the rationale and scope of his own role, as well as what other supervisors were doing in their supervisory roles. Additionally, as discussed in detail below, reports made to Curbow about Deffebaugh's performance are admissible to show Curbow's state of mind. In any event, Deffebaugh appears to contest only BNSF's assertion that terminal superintendents and assistant superintendents, unlike the new managers, did not work night shifts, which does not appear to be a material detail. *Id*.

Problems between employer and employee evidently first emerged with the June 2011 change-up. Until mid-2011, Deffebaugh had received mostly "on target" ratings on her semi-annual performance reviews. *Id*. ¶¶ 58-63; DSOF ¶¶ 58, 60-62 (noting that Deffebaugh received some "needs improvement" ratings in certain categories). BNSF asserts that the new terminal managers soon found a number of deficiencies in Deffebaugh's performance, however, including frequently being absent from her computer, unresponsive to cell-phone calls, and unfindable anywhere in the terminal, which resulted in disruptions to customer service and her other duties. *Id*. ¶¶ 12-13. In one instance, Deffebaugh was needed to assist with an emergency but could not be reached for two hours. *Id*. ¶ 14. In another, she ignored instructions to deal with a suspected gas leak, claiming that a yardmaster, who has no authority over her, told her not to assist. *Id*. ¶ 15. Although BNSF officers are expected to read and respond immediately to what are known as "CAD" communications (if CAD is an acronym, the parties do not explain what it stands for), BNSF further asserts, Deffebaugh often failed to log on to the system promptly or at all, and ignored other CADs from dispatchers and trainmasters. *Id*. ¶ 16. According to Curbow, who questioned her about her failure to respond to an upper-level officer's communication, Deffebaugh stated, "Screw it, I'm not going to answer his CAD." *Id*.; Pl.'s Resp. DSOF ¶ 16 (adding that Deffebaugh said this in response to comments suggesting he was "being funny").

Additionally, Deffebaugh allegedly failed to participate regularly in weekly safety operations conference calls, even though the superintendent required all

trainmasters to do so; did not wear appropriate protective equipment; referred to BNSF safety inspectors as "the hit team"; and inappropriately organized "races" between railroaders to see "which job could get three trains out first." DSOF ¶ 17. She refused to follow the dress code and conversed excessively with subordinates about her personal life. *Id*. ¶ 18. Finally, without authorization, Deffebaugh accessed BNSF's employee management software and altered the trainmasters' schedules to show herself as on vacation at the same time as her coworkers. *Id*. ¶ 19.

In response to these complaints about her work, Deffebaugh mostly does not speak to the underlying truth of the assertions but objects on the grounds that they are inadmissible hearsay because they are based on Curbow's deposition testimony, testimony for which Deffebaugh argues Curbow lacks personal knowledge. *See* Pl.'s Resp. DSOF ¶¶ 14-18. She does concede, however, that she failed to promptly sign into the CAD system (she contends that she had other work duties, but BNSF prioritized CAD messages as requiring immediate response); missed one conference call; did not wear protective equipment; called inspectors a "hit team"; organized train-dispatch races' and ignored the dress code. *Id*. ¶¶ 16-18; *see also* PSOF ¶ 78 ("There are times Deffebaugh could not log into the system to receive CAD messages because she had other work related duties."). Concerning the vacation-scheduling incident, Deffebaugh does not deny she accessed the software system but responds that she believed her actions were authorized. Pl.'s Resp. DSOF ¶ 19. As for her being absent from her desk and ignoring telephone calls, Deffebaugh asserts

4

that she was simply in the restroom or carrying out work duties at the direction of her supervisor. PSOF ¶¶ 75-76.

## B. Performance Improvement Plan

In January 2012, terminal manager Curbow, terminal superintendent Abrahamson, and the assistant superintendent met with Deffebaugh for her year-end performance review and gave her a "needs improvement" rating. PSOF ¶ 22. Deffebaugh acknowledges that, after being told exactly how her performance was failing expectations, she refused to take a more proactive role in training new trainmasters—which was one of her job duties—and instead asked: "how could I train somebody if they gave me a needs improvement? … [T]he F student doesn't go on and lead the class." *Id.* ¶ 23. Deffebaugh believed the rating was part of a malicious effort to "slam" her. *Id.* In March 2012, Deffebaugh's managers developed a customized Performance Improvement Plan (often referred to in human resources as a "PIP"), approved by the human resources director, to help her correct her work deficiencies. *Id.* ¶ 24.

When BNSF management met with Deffebaugh to present the PIP on March 16, 2012, she arrived with a tape recorder, stated that "it feels like this is a lynching," and she stated that she would record their meeting, which was then postponed a day to allow the human resources director to attend. *Id.* ¶ 25. The PIP included a list of tasks, for which "[t]erminal management will provide coaching and counseling." *Id.* ¶ 27. It also read: "Successful completion of this plan will be evaluated by your ability to perform and complete a hundred percent of the items

listed on time and to satisfaction." *Id*. ¶ 26. Deffebaugh understood that she would be dismissed if the plan was not completed and her performance improved by June 15, 2012. *Id*. ¶¶ 26, 28 Despite also understanding that the PIP was to remain confidential, Deffebaugh sent an email to the entire terminal staff describing her progress on one of her PIP objectives. *Id*. ¶ 27. The PIP also included on-line training courses to be completed after duty hours, but, it is undisputed, Deffebaugh completed them in the trainmasters' office in the presence of her colleagues, recording herself reading the course materials aloud. *Id*. ¶ 30.

Although the PIP required Deffebaugh to schedule weekly meetings on her progress with Curbow, BNSF asserts she made little effort to do so and instead complained that Curbow would not meet with her, including during his vacation time. *Id*. ¶ 29. Deffebaugh states that she did attempt to contact Curbow three times but he failed to respond each time. PSOF ¶ 80. At a mid-April 2012 meeting that did take place, Deffebaugh asserts, Curbow threatened to have her fired. DSOF ¶ 37. According to Deffebaugh, Curbow also threatened five other employees, including two Caucasian males. *Id*. ¶ 38.

By the end of April, Deffebaugh was not on target to complete the PIP, and BNSF gave her an additional nine weeks to complete it. *Id*. ¶ 31. Despite this additional time, according to BNSF, Deffebaugh's performance did not improve. *Id*. ¶ 32. She continued to fail to respond to communications, to inform others she was leaving her station, and to participate in safety calls. *Id*. ¶ 33. She berated two of her supervisors for an apparently unfounded opinion that they had performed

poorly on a safety test. *Id*. ¶ 34. She also notified train crews that were supposed to be *randomly* tested of multiple confidential safety test schedules, in effect warning them of the random inspections. *Id*. ¶ 35. During this period, Curbow repeatedly warned Deffebaugh that her progress was inadequate. *Id*. ¶ 36.

### C. Safety Violations and Termination

Finally, BNSF asserts that Deffebaugh twice "fouled the track," that is, stepped onto or placed her body over a track within 100 feet of a moving train. DSOF ¶¶ 40-41. Fouling the track is considered one of the worst mistakes a railroad employee can make because of the possibility of death or serious injury. *Id*. ¶ 40. On the same day in July 2012, Deffebaugh first held a banner with her arms extended over the track and then later stepped onto the tracks to remove a piece of equipment, without communicating with the crew of a train fewer than 50 feet away. *Id*. ¶ 41. Deffebaugh was instructed not to conduct any more of these tests without a manager present, but she continued to do so in violation of orders. *Id*. ¶ 44. Again, Deffebaugh disputes the force of these allegations on the basis of Curbow's lack of personal observation of the events. Pl.'s Resp. DSOF ¶¶ 40-44.

Deffebaugh received her mid-year performance review in August 2012 and was again given a rating of "needs improvement." DSOF ¶ 45. Also in August 2012, Deffebaugh emailed her supervisors to request to be released from her Galesburg duties, apparently in response to a comment from BNSF's Vice President of safety that the company was "more than willing to train [her] on system safety on her days off." *Id*. ¶ 47. Deffebaugh claims that the company had offered her a job-shadowing

position in Fort Worth, Texas at corporate expense until a new position could be found for her. *Id*. On August 17, Curbow met with Deffebaugh for her final PIP meeting; because she had not shown improvement, Deffebaugh was placed on administrative leave pending review of her safety violations and then later was dismissed. *Id*. ¶ 48.

### D. Alleged Discrimination

For her part, Deffebaugh points to the following facts in support of her discrimination claims, which are mostly described without a statement as to place, time, and context. Certain crew members told her that the trainmasters had joked on one occasion that because she was female and African-American, Deffebaugh "did not fit in with the rest of the group." DSOF ¶ 50. Deffebaugh overheard two trainmasters say that "they felt comfortabler [sic] being trained by gentlemen," and expressed a preference to work with her male peers. *Id*. Trainmasters also refused to train Deffebaugh. PSOF ¶ 66. Abrahamson, the superintendent, also said that he "felt better with Scott Tweet [a male trainmaster] on the desk." DSOF ¶ 50. In addition, after Deffebaugh wrote "something" about being an African-American woman in a self-evaluation, Abrahamson "did not even address it at all." *Id*. ¶ 51. Abrahamson also did not attend or sponsor a diversity meeting organized by Deffebaugh, even though she herself acknowledges that he was never asked to attend. *Id*.

Deffebaugh also notes that despite the fact that the reforms that led to the hiring of four terminal managers (all male) were spurred by a desire to improve

safety, none of the previous Caucasian and male employees who had been responsible for the supposed previous lack of safety were disciplined. PSOF ¶ 70. A "Mr. Pilkington," who appears to be identified as a Caucasian male, was told he had violated safety rules when he had potholes filled by a "stealth team" but was not disciplined. *Id.* ¶ 81. Deffebaugh adds that she was given tasks her Caucasian male colleagues were spared, such as "participating in the 1500 operations calls." *Id.* ¶ 71. She also asserts as a factual matter that she "was set up for failure by management blaming her" for a late report on an employee who was injured when she was not on site, and then singled out for punishment because of her race and gender. *Id.* ¶¶ 72-73.

With regard to her retaliation claim, Deffebaugh asserts as a factual matter that she was dismissed only after sending the email about possible job shadowing. *Id.* ¶ 53. She also adds that she was dismissed after Curbow once "threatened" to dismiss her, although Deffebaugh concedes that when she complained about this threat, she did not raise either the issue of race or gender. *Id.*

### E. This Lawsuit

Deffebaugh timely filed this lawsuit in December 2012, after receiving a right to sue notice from the U.S. Equal Employment Opportunity Commission. *See* R. 1, Compl. The complaint advanced four counts: a Title VII race discrimination claim, a Title VII sex discrimination claim, a Title VII retaliation claim, and an Illinois common law claim against Curbow and Abrahamson for intentional interference with employment. *Id.* ¶¶ 48-62. The state-law claim against the individuals was

later voluntarily dismissed, R. 19, Stip. Dismissal, leaving only the Title VII claims against BNSF in play.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Discussion

### A. Alleged Violation of Rule 56.1(a)

As a threshold matter, Deffebaugh objects to BNSF's Rule 56.1 Statement of Facts on the grounds that, by her count, the railroad's 53 numbered statements actually include a total of 126 discrete factual assertions. R. 93, Pl.'s Resp. Br. at 1. The Local Rules state that "[a]bsent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact." Local Rule 56.1(a)(3). A district court has broad discretion in ensuring compliance with its rules governing summary judgment. *See, e.g.*, *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004). As a remedy for the asserted violation, Deffebaugh seeks to have all of BNSF's statements of fact disregarded and, with no supporting facts consequently left to buttress it, the summary judgment motion denied. Pl.'s Resp. Br. at 1.

Deffebaugh appears to believe that each separately numbered statement (the individual entry) in the Statement of Facts (the document as a whole) must be limited to one, and only one, fact. To give an example, Deffebaugh complains that Defendant's statement ¶ 15, which deals with the incident where Deffebaugh failed to respond to a gas leak as ordered, actually includes four separate facts.[4] Pl.'s Resp. Br. at 1-2. But the Rules specifically describe how the Statement of Facts is

---

[4]The statement reads in full: "Subsequently, Deffebaugh was instructed to immediately assist with a suspected gas leak. Deffebaugh ignored her manager's instructions. When confronted, the excuse she offered was that a yardmaster, who has no supervisory authority over Deffebaugh, told her not to assist. In addition, she ignored Terminal Manager Christian's directive to keep him informed of her whereabouts." DSOF ¶ 15 (citations omitted).

comprised of "short numbered paragraphs," each including "specific references to …

supporting materials relied upon to support the *facts* set forth in that paragraph."

Local Rule 56.1(a)(3) (emphasis added). Each numbered statement (otherwise

referred to as a paragraph) may incorporate related factual details, so long as it

allows the non-movant to respond in kind to the assertions it makes. *See* Local Rule

56.1(b)(3); *see also Fishering v. City of Chicago*, 2009 WL 395462, at *2 (N.D. Ill.

Feb. 18, 2009) ("The local rule does not restrict a paragraph to one fact or one

sentence."). To be sure, very often the best practice will be to limit the paragraph to

only one fact, and asserting more than one fact does expose the party to an

argument that Local Rule 56.1 is being abused. Here, although a handful of BNSF's

statements would have been better split-up into multiple paragraphs, *see* DSOF

¶¶ 17, 50-51, 53 (incorporating bullet points or sub-paragraph numbers), that is the

extent of the problem. Indeed, most of BNSF's statements are properly and

efficiently organized around discrete incidents with common, related factual details.

BNSF's Statement of Facts may stand.

## B. No Genuine Issue for Trial

### 1. Discrimination

Turning to the merits of the motion, BNSF argues that Deffebaugh has not

presented any evidence that could possibly establish a prima facie case of race and

gender discrimination. R. 83, Def.'s Br. at 13-18. BNSF is correct. Despite

Deffebaugh's beliefs to the contrary, her response—which boils down to the

argument that BNSF's assertions about her performance rely on inadmissible

hearsay and to a general denial that some of the violations she is accused of committing ever took place, Pl.'s Resp. Br. at 9-18—is insufficient to create a genuine issue for trial. To survive summary judgment in a Title VII case, a plaintiff requires either direct or indirect evidence of discriminatory intent, though of course the record evidence must be viewed in the plaintiff's favor. *See Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). Deffebaugh presents neither form of evidence on which a reasonable jury could find for her.

### a. No Direct Proof

"The direct method of proof relies on direct and circumstantial evidence to show an inference of intentional discrimination." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006). The record does not reveal even circumstantial evidence that actions taken against her were motivated by her race and gender: nothing, for instance, along the lines of "suspicious timing, ambiguous statements oral or written, or behavior toward or comments directed at other employees in the protected group." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)) (alteration omitted). Deffebaugh points to the allegations, taken as true for present purposes, that other trainmasters refused to train Deffebaugh and that she once heard them joke that she "did not fit in" and that they preferred to work with men. PSOF ¶ 66; DSOF ¶ 50. The problem is, of course, that these allegations concern the behavior of her fellow *trainmasters*, not of her supervisors or anyone else with management authority at BNSF. Coworker actions can come into play in

the context of discrimination claims based on a hostile work environment, but Deffebaugh does not raise such a claim (and, in any event, includes no facts showing that BNSF was negligent in discovering or remedying any kind of harassment—even if the stray remarks Deffebaugh identifies could be said to rise to such a level). *See*, *e.g.*, *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). It is also true that non-decisionmaker conduct may be relevant if it is the proximate cause for the decisionmaker's action against the employee. But Deffebaugh does not advance that theory. As for Superintendent Abrahamson's comment that he "felt better with Scott Tweet," DSOF ¶ 50, this context-less statement by itself does not evince any kind of improperly motivated bias. He might have "felt better" with Tweet (to what end, we do not know) for a variety of conceivable and legally permissible reasons. Without more foundation of the circumstances surrounding this statement—and Deffebaugh provides none—it simply does not imply discriminatory motive.[5] Deffebaugh must therefore resort to the indirect method of proof.

### b. No Indirect Proof

Under the *McDonnell Douglas* burden-shifting framework, the indirect method requires evidence of (1) plaintiff's membership in a protected class, (2) job performance by the plaintiff that met the employer's legitimate expectations, (3) an

---

[5]Although Deffebaugh does not point to these in her response brief, the Court notes that the Rule 56.1 Statement also includes vague assertions that Abrahamson failed to address an unidentified "something" that Deffebaugh wrote on an evaluation about being an African-American woman and that he did not attend a diversity meeting to which he was not even invited. *Id*. ¶ 51. Without any more context, these allegations too do not constitute direct or circumstantial proof of discrimination.

adverse employment action, and (4) favorable treatment of a similarly-situated individual outside the protected class. *See Egonmwan*, 602 F.3d at 849; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If these elements are met, "a presumption of discrimination is raised, and the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its action." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (citation omitted). "If the employer meets this burden, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual." *Id.* (citation omitted). Here, although the first and third elements are not in dispute, Deffebaugh does not meet her burden of making a prima facie showing that she performed according to BNSF's legitimate expectations and that a similarly-situated comparator was more favorably treated.

### i. Job Performance Did Not Meet Legitimate Expectations

The deposition testimony of Curbow, Deffebaugh's supervisor, includes several examples of how Deffebaugh's job performance was deficient: failure to sign into the CAD communications system in a timely fashion, refusal to participate in at least one safety call, failure to wear protective gear and abide by the dress code, and organizing races between train crews. Pl.'s Resp. DSOF ¶¶ 14-18. These are incidents that Deffebaugh does not dispute occurred. Nor does Deffebaugh attempt to argue that compliance with communication requirements, safety and other attire rules, and refraining from treating train dispatch as a race were not legitimate employer expectations.

There were also, as described in detail above, numerous other alleged deficiencies: failure to respond to the gas leak, DSOF ¶ 15; refusal to train new workers, *id*. ¶ 23; making no effort to schedule meetings with Curbow despite an obligation to do so per the Performance Improvement Plan, *id*. ¶ 29; continued failure to respond to communications, *id*. ¶ 33; berating, without justification, two supervisors, *id*. ¶ 34; and warning train crews in advance of what were meant to be random inspections, *id*. ¶ 35. These assertions Deffebaugh *does* attempt to challenge, by arguing that BNSF "relies on hearsay testimony throughout their [sic] Rule 56.1 [Statement of Facts] and Curbow[,] the only person to have his deposition taken other than Deffebaugh, has no personal knowledge" of the performance deficiencies in question. Pl.'s Resp. Br. at 13-16. It is true that "[e]vidence supporting or opposing summary judgment must be admissible if offered at trial," *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) (citation omitted), and hearsay, of course, is inadmissible. Deffebaugh reasons that she "has contested the facts underlying the alleged performance issues" and that "we have not only a dispute of material fact, but Deffebaugh[']s direct testimony against the hearsay testimony of Curbow." Pl.'s Resp. Br. at 15. That is not accurate.

First, in her response to BNSF's Statement of Facts, her own Statement of Additional Facts, and her brief, Deffebaugh does not actually contest most of the allegations surrounding her performance. To respond to the charges of her continuing unresponsiveness and absences from her station, Deffebaugh explains without specificity that she "was away from computer because she was in rest room

16

or laying off a crewmember," that in any case her supervisor knew where she was, and that she did not receive CAD messages because "she *could* have been at a derailment" or had other work duties. Pl.'s Resp. Br. at 6 (citing Deffebaugh's deposition transcript) (emphasis added). She also adds that, when told to answer a supervisor's communication, her flippant refusal—"screw it"—was justified because the senior employee was being "funny." *Id.* (same). As for the serious safety violations cited by Curbow, Deffebaugh asserts she "did not commit a safety violation in fouling the track as what she did had been done in the yard since she had always worked at BNSF." *Id.* at 8 (same). She also explains away her negative safety ratings as being blamed for "stuff that was done by the superintendent before Curbow was employed as the manager." *Id.* at 5 (same).

But even if her explanations were enough to create a dispute over these specific charges, however, Deffebaugh points to nothing in the record to contest the rest of the laundry list of alleged workplace deficiencies which formed the basis for her termination. It was Deffebaugh's obligation, as the party asserting that facts are in genuine dispute, to "support the assertion by citing to particular parts of materials in the record, including depositions[.]" Fed. R. Civ. P. 56(c)(1)(A). Deffebaugh did not do so, and "it [is] not the district court's job to sift through the record and make [Deffebaugh's] case for [her]." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). As a result, there is no dispute of material fact over several incidents (dress code/safety gear violations, breaking the

confidentiality requirement of the PIP, berating supervisors, warning train crews about surprise inspections, racing to dispatch trains), all of which support BNSF's employment decisions against Deffebaugh.[6]

Instead, Deffebaugh puts all her eggs in the hearsay basket, arguing that, even if she has not set forth specific facts from the record showing a genuine dispute, BNSF "cannot produce admissible evidence to support" *its* version of the facts. Fed. R. Civ. P. 56(c)(1)(B). But this argument misapprehends both the Rules of Evidence and its intersection with the substantive employment-discrimination standard. Hearsay is an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). BNSF offers Curbow's testimony *not* to prove the truth of the assertions being made (that is, that Deffebaugh in fact refused to help with the gas leak, ignored communications, altered her schedule on the BNSF computer system without permission, and so on), but rather to prove why Curbow decided to place Deffebaugh on a PIP and then, ultimately, fire her. The ultimate issue in the case is the decisionmaker's motivation, and Curbow's testimony on what he was told and what was the basis for

---

[6]Deffebaugh, in order to show that she did meet expectations, relies on her generally better performance reviews in the *pre*-2011 period. Pl.'s Resp. Br. at 6. But generally speaking (and Deffebaugh offers no specific reason otherwise), these evaluations are not relevant. *See Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010) (whether plaintiff met employer's expectations in past, as opposed to period of alleged discrimination, is irrelevant) (citation omitted). Moreover, Deffebaugh's assertions that she was elected to receive a risk-reduction award (BNSF counters she was only nominated, Def.'s Resp. PSOF ¶ 93) and that no one was injured under her tenure are also neither here nor there in responding to the specific problems that Curbow testified were the motivations for the employment decisions. Pl.'s Resp. Br. at 6, 9. Deffebaugh fails to explain how these facts, even taken in light most favorable to her, somehow negate the import of the string of deficiencies and violations identified.

his decisions are thus not hearsay when offered to show Curbow's state of mind.[7] To be sure, *if* Deffebaugh had managed to raise a fact dispute over whether Curbow *genuinely* believed that Deffebaugh had performed deficiently, then the claim would survive summary judgment. But she has failed to offer evidence on which a reasonable jury could rely to find that Curbow's belief about her performance problems was not genuine. She has not met her burden of establishing that she satisfied her employer's legitimate performance expectations.

### ii. No Similarly Situated Individuals Outside Class are Identified

Deffebaugh additionally fails to meet the fourth element of her prima facie case, identifying any similarly situated individuals outside of her protected class who were treated more favorably. "To create an inference of discriminatory intent, the indirect method requires the identification of similarly situated comparators because all things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014) (citation and internal quotation marks omitted). Deffebaugh asserts that "[w]hite males employees [sic] violated safety rules at BNSF and were not disciplined or terminated."[8] Pl.'s Resp. Br. at 8.

---

[7]Again, there are specific instances that Curbow, as Deffebaugh's direct, day-to-day supervisor, would have had personal knowledge: for examples, the fact that she did not properly follow up with *him* to set up PIP meetings or that she was tardy in responding to calls and CAD messages. *See also supra* n.3.

[8]Deffebaugh also asks why, if the 2011 restructuring of management was in order to improve safety, no one was punished for what must have been previously lax standards. Pl.'s Resp. Br. at 12. This is nothing but speculation. The fact that management was changed does not imply that any individual necessarily merited the same adverse action later imposed on Deffebaugh.

But the only example from the record that she points to is an otherwise unidentified "Mr. Pilkington" who "was filling in potholes in the track" when cited for a violation, the nature of which is unidentified, by a "stealth team." *Id.* (citing portions of Deffebaugh's deposition transcript). This assertion is insufficient to create a triable issue, because no facts whatsoever are presented on his race, job responsibilities—*anything*—to show how this Pilkington was similarly situated to Deffebaugh.[9] Deffebaugh's assertion that the same stealth team found three other "deadly" safety violations, this time by unnamed persons, is deficient on the same grounds. *Id.* at 12. Summary judgment is proper where, as here, the record lacks a proper comparator, leaving the plaintiff with only her conclusions, rather than admissible evidence. *See Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001) (citations omitted).

### 2. Retaliation

Summary judgment against Deffebaugh's retaliation claim is also required. Similar to a direct discrimination claim, a plaintiff may establish retaliation under either a direct or indirect method of proof. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). "To establish retaliation under the direct method, a

---

[9]There is also a background reference, forgotten about in the arguments-section of her brief, to Deffebaugh's deposition testimony that a female employee named Karen Swedlund was threatened by Curbow. Pl.'s Resp. Br. at 8. The record is similarly devoid of any proper foundation for Swedlund as a similarly-situated individual. Next, Deffebaugh alludes to having been given tasks that white trainmasters were not. *Id.* at 8. Aside from giving the example of having to participate in operations calls, Deffebaugh again offers no details to begin to understand this assertion, including any details about the nature of these calls. Finally, Deffebaugh refers to a "Mr. Bechman," who apparently was not punished despite similar conduct to Deffebaugh's, but this mention lacks any citation to the record. *Id.* at 12.

plaintiff must present evidence, direct or circumstantial, showing that: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal connection exists between the two." *Id.* (citing *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006)). The indirect approach requires Deffebaugh to show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he met h[er] employer's legitimate expectations, i.e., [s]he was performing h[er] job satisfactorily; (3) [s]he suffered a materially adverse action; and (4) [s]he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity." *Id.* at 309 (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)).

As discussed in the context of her discrimination claim, Deffebaugh has not produced a record that can allow any reasonable finder of fact to conclude that she met BNSF's legitimate expectations and performed her job satisfactorily, nor has she established that any similarly situated employee was treated more favorably. These deficiencies mean that she cannot likewise put forward a prima facie case of retaliation via the indirect method of proof.

An even more foundational problem, one that scuttles any direct approach as well, is that Deffebaugh can point to no valid example of her having engaged in statutorily protected activity. That activity is, of course, a necessary predicate to her claim (a plaintiff has to show that there was some event that compelled the employer to retaliate). The only activity Deffebaugh asserts was that "she informed BNSF on an official company document; her PIP, that she felt different treatment

because she was an African-American female." Pl.'s Resp. Br. at 18. With no citation to supporting evidence, it is unclear to which document she refers. The only thing in the record that the Court can divine this assertion might relate to is Deffebaugh's having written "something" about being an African-American female in a self-evaluation, which Abrahamson "did not even address [ ] at all." DSOF ¶ 51. "While a report of discrimination to a supervisor may be statutorily protected activity under Title VII, the report must include a complaint of … discrimination or sufficient facts to raise that inference." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (national origin discrimination claim) (citations omitted). Whether Deffebaugh refers to the "something" she wrote in the self-evaluation or some other document, there is no indication at all that it included sufficient facts alerting BNSF, or raising the inference, that Deffebaugh was complaining of discrimination. Deffebaugh therefore points to nothing in the record to support her assertion that she complained of differential treatment.

Finally, Deffebaugh argues that there is a genuine issue of material fact as to retaliation by citing the conclusory allegations that "similarly situated employees were allowed to commit serious safety violations" and that white male employees were not disciplined for the same conduct Deffebaugh was. Pl.'s Resp. Br. at 18-19. It is not apparent why Deffebaugh characterizes these assertions as evidence of retaliation—all Deffebaugh does is rehash the same allegations of underlying discrimination. Accordingly, Deffebaugh has failed to establish a prima facie case of retaliation under either the direct or indirect method of proof.

## IV. Conclusion

For the reasons given above, BNSF's motion for summary judgment is granted.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 16, 2015